## SANDERS v. OKLAHOMA CITY et al.
### No. 1916.

District Court, W. D. Oklahoma.
March 12, 1937.

electrical installations; and the ordinance requirement that only licensed journeymen of respective crafts can be employed, and in certain instances, installations must be done by masters under a subcontract.

The plaintiff contends he is not amenable to any of the provisions of the building code or ordinance of Oklahoma City, as construction operations are carried on entirely within the boundaries of land to which title is in the United States of America, as all political jurisdiction of the state and her subdivisions has been ceded therein to the general government.

The defendants have filed a motion to dismiss the bill. At the hearing on the motion to dismiss, the court reserved a ruling on the motion and proceeded to hear the application of the plaintiff for a temporary injunction. The facts in the case were stipulated and it was agreed that the hearing might be heard on application for a permanent injunction.

The defendants, in support of their motion to dismiss, have stated their reasons as follows:

1. The federal government does not and cannot act in its sovereign capacity except in instances where the Federal Constitution grants the power to act, or such power exists as a necessary incident to a granted power.

2. The power of the federal government as a sovereignty exists only for governmental purposes.

3. When the federal government engages in an enterprise beyond its granted or incidental power, it does not do so as a sovereignty, and when such acts conflict with the reserved police power of the state, the latter authority prevails and is supreme.

John Shirk, of Oklahoma City, Okl., for plaintiff.

Harlan Deupree, Municipal Counselor, of Oklahoma City, Okl., for defendants.

VAUGHT, District Judge.

The plaintiff in this action seeks to enjoin the municipality of the city of Oklahoma City, its officers and inspectors, from interfering with the construction of improvements on property in Oklahoma county, owned by the United States of America, by enforcing certain provisions of municipal ordinances as to municipal inspection of plumbing, sewer, steam, gas fitting, and

4. The federal government in this case is engaged in an enterprise beyond any granted or incidental power under the Federal Constitution and therefore a conflict in sovereignty between the federal government and the state is not an issue. The work thereof is subject to the superior authority and police power of the state, which has been delegated by the state to the city of Oklahoma City.

5. Even though it be conceded herein that the federal government is acting in its sovereign capacity, the Congress has given back to the city the power and authority to enforce its police regulations.

Under the stipulation of the parties, the court finds the facts to be as follows:

On or about October 2, 1935, South Oklahoma Town Company, a corporation, for a recited consideration of $109,990, passed title to the United States of America to the real estate described in the bill. The deed passing such title was filed for record in the office of the county clerk of Oklahoma county and the record owner of said real estate remains as stated in said deed.

On July 9, 1936, a written contract was entered into between the United States of America, acting by and through Horatio B. Hackett, Federal Administrator of Public Works, and plaintiff, Leo Sanders, said contract providing that for a recited consideration of $1,559,965, the plaintiff, as contractor, became obligated to provide all labor and furnish all materials necessary for the construction of certain buildings and other improvements known as "Rotary Park Housing Project, H-8101."

In accordance with the provisions of the construction contract, the plaintiff, as contractor, in due time began construction of the buildings to be erected as provided in said contract as shown by drawings, specifications, etc.

Shortly after the contractor began his operations, the municipal authorities of the defendant city of Oklahoma City made a ruling that the contractor, in the construction of the improvements, was in all respects amenable to certain provisions of the ordinances of Oklahoma City.

The city ordinances relied upon by the defendants constitute what is known as the building code of Oklahoma City and regulates with particularity the granting of permits for the construction of buildings, the manner in which the buildings may be erected, the class and type of materials used, and furthermore provides for the inspection of the work and particularly regulates the type and character of plumbing service that may be rendered; and it is the contention of the defendants that the buildings erected by the United States government shall be subject to the provisions of said building code of Oklahoma City, in all particulars.

The contractor proceeded with the construction of the buildings provided in his contract with the United States' government and declined to follow the provisions of the building ordinances of Oklahoma City.

On information filed by the plumbing inspector for the city, a warrant was issued for the contractor, a trial was had, and the contractor was found guilty in the municipal court.

The contractor alleges that he is threatened with arrest for every day that he proceeds with said building without submitting to inspection as provided by the ordinances of Oklahoma City, and further alleges in his bill that compliance on his part with the provisions of the ordinances of Oklahoma City would result in an added cost of construction of not less than $50,000.

Consideration will be given first to the motion of the defendants to dismiss.

It is apparent that the property in question is owned by the United States of America.

Under the Act of Congress (June 27, 1934, c. 847, § 1, 48 Stat. 1246, as amended by Aug. 23, 1935, c. 614, § 344 (a), 49 Stat. 722, 12 U.S.C.A. § 1702), there was created what is known as the Federal Housing Administration, and the act provides:

"The President is authorized to create a Federal Housing Administration, all of the powers of which shall be exercised by a Federal Housing Administrator, * * * who shall be appointed by the President, by and with the advice and consent of the Senate. * * * The Administrator shall, in carrying out the provisions of this title and titles II and III, be authorized, in his official capacity, to sue and be sued in any court of competent jurisdiction, State or Federal."

By Executive Order No. 7280, promulgated January 28, 1936 (12 U.S.C.A. § 1702 note), the President validated and confirmed the creation of the Federal Housing Administration, which in detail provides for the acquisition of suitable lands and the construction thereon of low cost houses for occupancy by tenants or to be sold on long term payments to certain individuals desiring to purchase same for homes.

It is not contended that the plaintiff in this case is not proceeding in the construction of the buildings in question, pur-

suant to the Act of Congress, the Executive Orders of the President, the general provisions adopted and approved by Executive Orders of the Low Cost Housing Administration, and the building contract entered into between the United States of America and the plaintiff herein.

█ Clearly, this court would have jurisdiction then to entertain the bill as filed.

The main question raised in this case is whether or not the ordinances of Oklahoma City and its building code are applicable to the construction of buildings by the United States of America on lands owned entirely by the United States.

The Act of Congress of June 16, 1933 (48 Stat. 201, c. 90, § 202) provides:

"The Administrator, under the direction of the President, shall prepare a comprehensive program of public works, which shall include among other things the following: * * * (d) construction, reconstruction, alteration, or repair under public regulation or control of low-cost housing and slum-clearance projects."

The specifications adopted by the Low Cost Housing Administration provide:

"The Contractor shall without additional expense to the Government obtain all required licenses, permits, certificates, etc., for work outside the Government's property lines, relating to the use of streets and sidewalks, the protection of public traffic, connections to utility service lines, etc. The Contractor will not be required to obtain building or other permits for work inside the Government's property lines."

"The contractor shall arrange for all local inspections to meet municipal and utility requirements and procure all certificates and obtain and pay for all inspections and permit fees and penalties which may arise in connection with the work outside, but not inside the Government's property lines at no additional expense to the Government."

The contract between the government and the plaintiff provides:

"The Contractor shall furnish all labor and materials and perform all work required for construction of superstructure for Rotary Park Housing Project, No. H-8101, in Oklahoma City, Oklahoma, for the consideration of the sum of One Million Five Hundred Fifty-Nine Thousand Nine Hundred Sixty-five Dollars ($1,559,965)."

The contract also refers to the specifications and drawings and covers the question of changed conditions, extras, etc.

Article 6 of the contract is as follows:

"Inspection.—(a) All material and workmanship (if not otherwise designated by the specifications) shall be subject to inspection, examination, and test by Government inspectors at any and all times during manufacture and construction and at any and all places where such manufacture and construction are carried on. The Government shall have the right to reject defective material furnished by the Contractor which shall be satisfactorily replaced with proper material without charge therefor, and the Contractor shall promptly segregate and remove the same from the premises.

"(b) The Contractor shall furnish promptly without additional charge, all reasonable facilities, labor, and materials necessary for the safe and convenient inspection and test that may be required by the inspectors. All inspection and tests by the Government shall be performed in such manner as not to unnecessarily delay the work. Special, full size, and performance tests shall be as described in the specifications. The Contractor shall be charged with any additional cost of inspection when material and workmanship is not ready at the time inspection is requested by the Contractor."

Article 11 of the contract provides for the character of labor employed, hours per day and week, etc.

Article 20 of the contract, as amended, provides:

"With respect to all persons employed under this contract, except as otherwise provided in Regulation No. 2, issued by Executive Order No. 7060, dated June 5, 1935, (i) such persons shall be referred for (ii) preference in employment shall be given to persons from the public relief rolls; provided that persons not on public relief rolls may be employed on this project where qualified persons cannot be obtained from the public relief rolls and provided further, that supervisory, administrative, and highly skilled workers on the project, as defined in the specification, need not be so referred by the United States Employment Service, provided that when the organized labor, skilled or unskilled, is desired by any contractor employed to handle all or any part of this project, the contractor shall re-

quisition such workers as may be required from the representative of each recognized union concerned, the representative of the union will select union members for work on the project giving preference, first, to those members of the union who are on the local public relief rolls, second, upon exhaustion of union members on such rolls, to any other members of the union; actual assignment of these workers to projects thereafter will be the responsibility of the Works Progress Administration."

"(b) Except as specifically otherwise provided in this Contract workers who are qualified by training and experience and certified for work on the project by the United States Employment Service shall not be discriminated against on any ground whatsoever.

"(c) The Contractor shall have the right, subject to disapproval by the Contracting Officer to dismiss any employee.

"(d) Only one member of a family group may be employed on work under this Contract, except as specifically authorized by the Works Progress Administration."

It is apparent, therefore, from the contract and from the specifications that it was the purpose of the United States of America to purchase the land in question and erect the buildings thereon, to aid in relieving unemployment, and to be carried out under the direction and control of the United States government through the Housing Administration and the Works Progress Administration.

The specifications emphasize, as above shown, that the government had no thought that the application of local regulations would be made except "for work outside the government's property lines, relating to the use of streets and sidewalks, the protection of public traffic, connections to utility service lines," etc.

And they further provide: "The contractor will not be required to obtain building or other permits for work inside the government's property lines."

The specifications furthermore provide: "The contractor shall arrange for all local inspections to meet municipal and utility requirements * * *, but not inside the Government's property lines."

The question arises as to whether or not the lands in question were purchased with the consent of the state of Oklahoma.

Section 10053, Okl.Stats.1931 (80 Okl. St.Ann. § 1), is as follows:

"The consent of the State of Oklahoma is hereby given, in accordance with the seventeenth clause, eighth section, of the first article of the Constitution of the United States, to the acquisition by the United States, by purchase, condemnation or otherwise, of any land in this State required for sites for customs houses, postoffices, arsenals, forts, magazines, dockyards, military reserves, forest reserves, game preserves, national parks, irrigation or drainage projects, or for needful public buildings or for any other purposes for the government."

Section 10054, Okl.Stats.1931 (80 Okl. St.Ann. § 2), provides:

"Exclusive jurisdiction in and over any lands so acquired by the United States shall be, and the same is hereby ceded to the United States for all purposes except the service upon such sites of all civil and criminal process of the courts of this State; but the jurisdiction so ceded shall continue no longer than the United States shall own such lands."

It is clear that it was not the intention of the federal government to deprive the local government of its "civil and criminal jurisdiction in and over such property."

The Act of Congress, June 29, 1936, 40 U.S.C.A. § 421, supra, provides:

"And insofar as any such jurisdiction has been taken away from any such State or subdivision, or any such rights have been impaired, jurisdiction over any such property is hereby ceded back to such State or subdivision."

If the federal government has ceded back to the state that which the state had given to the federal government, it is only necessary to refer to the acts of the Oklahoma Legislature which ceded this authority to the federal government, to see what authority was surrendered by the state to the federal government. This is shown in section 10054, Okl.Stats.1931, supra, which provides "exclusive jurisdiction in and over any lands so acquired by the United States shall be, and the same is hereby ceded to the United States for' all purposes except the service upon such sites of all civil and criminal process of the courts of this State." This is easily understood.

It was not the intention of the federal government, in creating the low-cost hous-

ing district, to permit that district to be filled with occupants who would be immune from the criminal jurisdiction of the locality in which it was located, nor was it its intention to shield an occupant of one of the houses owned by the federal government from service by civil process in the state court. One could not commit murder and then protect himself against criminal prosecution by the state by contending that he was occupying and living upon property owned by the United States of America; nor could one purchase groceries, clothing, and other supplies, refuse to pay therefor, and when sued in a civil action in state court could shield and protect himself by saying that he was not subject to be sued in state court, and civil process could not be served on him because he lived in a house owned by the United States of America. But to say that the United States could not erect the character of a house that it wanted to erect upon its own property without the consent of the municipality in which the property is located is preposterous on its face.

It is not probable that the city of Oklahoma City or the state of Oklahoma would have more rigid rules for the inspection of plumbing, and other construction work involved in the construction of the buildings in question, than those adopted and used by the United States government.

The court is just a little at a loss to understand whether or not the city of Oklahoma City and its officers are sincere in raising the question that the Act of Congress which provides for the purchase of these lands and the construction of these buildings is unconstitutional and void. However, in the first four propositions in the defendants' brief this question is clearly raised.

■ Neither the city of Oklahoma City nor the state of Oklahoma is in a position to consistently raise this question.

The same act which provides for the construction of the low-cost houses provides for loaning money to municipalities for public improvements and to states for the same purpose. Since Oklahoma City acquired millions of dollars under this same act to assist in the construction of a city hall, city auditorium, the construction of sewers, sidewalks, and other municipal improvements, and the state of Oklahoma has received millions of dollars for the construction of public buildings, neither the city nor the state can with vigorous consistency question the constitutionality of the act, under which they have profited, as above indicated.

The court does not care to consider the constitutional question in this hearing. Inferior federal courts are often viciously criticized for holding an Act of Congress unconstitutional and federal District Courts are not anxious to assume the responsibility of determining the constitutionality of an Act of Congress when it is not necessary so to do, and particularly when the Supreme Court of the United States will have an opportunity to determine the constitutionality of the act.

■ I therefore feel that in passing upon the question that is now before the court, the constitutionality of the act is immaterial. The land has already been purchased and is now owned by the United States government, the money has already been appropriated, the contract has been let, the construction work is progressing, and the courts have repeatedly held that the United States government has the right to dispose of property in its possession and control regardless of whether the original act, under which the property was acquired, is constitutional or not.

Another question is raised whether or not the low-cost housing project can be conceived to be included in "for needful public buildings or for any other purposes for the government." It seems that the question raised by the Attorney General, in his amicus curiæ brief, as well as that raised by the city, would challenge the wisdom of the legislative body in enacting the law rather than the constitutionality of the act.

The court is frank to admit that there are many things connected with the appropriation of money for disposition under the Works Progress Administration that appear to be inconsistent with the constitutional powers of Congress, but that is a question which may be reserved for the higher courts.

■ This court is satisfied that in the construction of these buildings by the United States government, the actual construction work, entirely upon lands owned by the United States of America, is exclusively in the control of the federal government and that no state law or city ordinance could be invoked to in any way interfere with

**56**

the free exercise of judgment by the federal government in this construction work.

The motion to dismiss is overruled and exception allowed. A temporary injunction against the defendants, as prayed for in plaintiff's bill, is granted and in accordance with the stipulation of the parties, at the trial of this case, the temporary injunction will be made permanent. An exception is allowed to the defendants.